IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| RICHARD JERREL OWENS, II, | ) | CIVIL ACTION NO. 9:14-2043-DCN-BM |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **REPORT AND RECOMMENDATION** |
| | ) | |
| CAROLYN W. COLVIN, | ) | |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY ADMINISTRATION, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

The Plaintiff filed the Complaint in this action pursuant to 42 U.S.C. § 405(g),

seeking judicial review of the final decision of the Commissioner wherein he was denied disability

benefits. This case was referred to the undersigned for a report and recommendation pursuant to

Local Civil Rule 73.02(B)(2)(a), (D.S.C.).

Plaintiff applied for Disability Insurance Benefits (DIB) on March 28, 2011

(protective filing date), alleging disability as of December 16, 2005 due to knee and ankle problems,

and post traumatic stress disorder (PTSD). (R.pp. 164-167, 188, 199). Plaintiff's claim was denied

both initially and upon reconsideration. Plaintiff then requested a hearing before an Administrative

Law Judge (ALJ), which was held on November 2, 2012. (R.pp. 39-80). The ALJ thereafter denied

Plaintiff's claim in a decision issued March 4, 2013. (R.pp. 13-35). The Appeals Council denied



Plaintiff's request for a review of the ALJ's decision, thereby making the determination of the ALJ the final decision of the Commissioner. (R.pp. 1-5).

Plaintiff then filed this action in this United States District Court, asserting that there is not substantial evidence to support the ALJ's decision, and that the decision should be reversed and remanded for further consideration, or for an outright award of benefits. The Commissioner contends that the decision to deny benefits is supported by substantial evidence, and that Plaintiff was properly found not to be disabled.

**<u>Scope of review</u>**

Under 42 U.S.C. § 405(g), the Court's scope of review is generally limited to (1) whether the Commissioner's decision is supported by substantial evidence, and (2) whether the ultimate conclusions reached by the Commissioner are legally correct under controlling law. <u>Hays v. Sullivan</u>, 907 F.2d 1453, 1456 (4th Cir. 1990); <u>Richardson v. Califano</u>, 574 F.2d 802, 803 (4th Cir. 1978); <u>Myers v. Califano</u>, 611 F.2d 980, 982-983 (4th Cir. 1980). If the record contains substantial evidence to support the Commissioner's decision, it is the court's duty to affirm the decision. Substantial evidence has been defined as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. **If there is evidence to justify refusal to direct a verdict were the case before a jury, then there is "substantial evidence."** [emphasis added].

<u>Hays</u>, 907 F.2d at 1456 (citing <u>Laws v. Celebrezze</u>, 368 F.2d 640 (4th Cir. 1966)); <u>see</u> <u>also</u> <u>Hepp v. Astrue</u>, 511 F.3d 798, 806 (8th Cir. 2008)[Noting that the substantial evidence standard is even "less demanding than the preponderance of the evidence standard"].

2



The Court lacks the authority to substitute its own judgment for that of the Commissioner. <u>Laws</u>, 368 F.2d at 642. "[T]he language of [405(g)] precludes a *de novo* judicial proceeding and requires that the court uphold the [Commissioner's] decision even should the court disagree with such decision as long as it is supported by 'substantial evidence.'" <u>Blalock v. Richardson</u>, 483 F.2d 773, 775 (4th Cir. 1972).

### Discussion

A review of the record shows that Plaintiff, who was thirty-two (32) years old on his alleged disability onset date, has at least a high school education and past relevant work experience as an ammunition specialist.[1] (R.pp. 33-34). In order to be considered "disabled" within the meaning of the Social Security Act, Plaintiff must show that he has an impairment or combination of impairments which prevent him from engaging in all substantial gainful activity for which he is qualified by his age, education, experience and functional capacity, and which has lasted or could reasonably be expected to last for a continuous period of not less than twelve (12) months. Further, the record reflects that Plaintiff's eligibility for DIB expired on December 31, 2010. (R.p. 18). Therefore, in order to be entitled to disability benefits, Plaintiff must show that his impairments became disabling by no later than that date. <u>See</u> 42 U.S.C. § 423(a)(1)(A), (c)(1)(B); <u>Johnson v. Barnhart</u>, 434 F.3d 650, 655-656 (4th Cir. 2005).

After a review of the evidence and testimony in this case, the ALJ determined that, although Plaintiff does suffer from the "severe" impairments[2] of adjustment disorder, narcissistic

---

[1]Plaintiff if a former member of the military.

[2]An impairment is "severe" if it significantly limits a claimant's physical or mental ability to do basic work activities. <u>See</u> 20 C.F.R. § 404.1521(a); <u>Bowen v. Yuckert</u>, 482 U.S. 137, 140-142
(continued...)

3



personality disorder, PTSD, chronic pain syndrome, left shoulder impingement syndrome, degenerative disease of the lumbar spine, and history of crush injury and ligament tears to his feet, ankles and knees, thereby rendering him unable to perform his past relevant work, he nevertheless retained the residual functional capacity (RFC) to perform a restricted range of sedentary work,[3] and was therefore not entitled to disability benefits. (R.pp. 18, 21, 33-34).

Pursuant to Local Rule 83.VII.04, D.S.C., Plaintiff was supposed to have filed a written brief within thirty (30) days of the filing of the Defendant's answer, setting forth the reasons he believes that ALJ and/or the Appeals Council committed reversible error in determining that he was not entitled to disability benefits. However, notwithstanding Plaintiff having been granted an extension of time of several months to file a brief setting forth his arguments for why reversal is warranted in this case, Plaintiff never filed a brief with the Court, and therefore neither the Court nor the Defendant have any idea what errors Plaintiff believes the ALJ and/or Appeals Council made in his case. See Bowen, 482 U.S. at 146 [Plaintiff has the burden to show that he has a disabling impairment]. Notwithstanding Plaintiff's failure to argue his case, however, the undersigned has undertaken an independent review of the record and the decision in this case, and after careful review of this record and the decision, finds that substantial evidence support the decision. Laws, 368 F.2d

---

[2](...continued)
(1987).

[3]Sedentary work is defined as lifting no more than 10 pounds at a time and occasionally lifting and carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met. 20 C.F.R. § 404.1567(a) (2005).



640 [Substantial evidence is "evidence which a reasoning mind would accept as sufficient to support a particular conclusion"].  Therefore, the decision should be affirmed.

## I.

### (Medical Record)

Plaintiff's medical records reflect that he was injured in April 2003 when a box containing several hundred pounds of ammunition was dropped on his right foot.  Plaintiff subsequently was granted a medical release from the military in May 2003 due to bilateral foot pain, worse on the right foot side, with a recommendation for podiatric evaluation and possible surgery. (R.p. 788).  Most of Plaintiff's medical records from this period are handwritten and hard to decipher, but it is apparent Plaintiff eventually had surgery on his foot sometime in the summer of 2003.  See generally, (R.pp. 1240-1260).  Some additional surgeries followed (R.pp. 1209, 1217-1221, 1225-1226, 1236), and on January 27, 2005 it was noted by orthopedist Dr. F. M. Moore that Plaintiff's right foot had a "claw toe deformity",[4] and that Plaintiff should be placed on a period of "limited duty" for eight months to include "no impact activity, no running or prolonged standing". It was also  noted that Plaintiff walked with a cane.  (R.p. 758).

The record further reflects that Plaintiff had an MRI on his left shoulder on April 18, 2005 after complaining of "chronic pain, grinding, loss of motion secondary to injury".  No plain radiographic abnormality was identified, and the report concluded that there was "no evidence of an acute fracture or dislocation.  No marked degenerative changes are seen.  The soft tissues are unremarkable."  The report did note that Plaintiff's distal rotator cuff was mildly hypertrophied with

---

[4]A condition where the toes bend down at the middle joints and at the joints nearest the tip of the toes.  This causes the toes to curl down toward the floor. http://www.healthline.com/symptom/claw-toe.



some abnormal signal within it, that he likely had a "tiny partial tear in the distal rotator cuff", and that he also had some "mild" hypertrophy of the left AC joint indicative of AC joint degenerative joint disease. (R.pp. 724-725).

Plaintiff also had some x-rays taken of his left foot on April 5, 2005 due to complaints of chronic pain. There was no definite acute fracture, dislocation or subluxation seen, and while there was osteophyte formation at the proximal end of the first tarsometatarsal joint and at the cuneiform, possibly due to osteoarthritic changes, the rest of the bony structure appeared unremarkable. Plaintiff was assessed with no acute bony abnormality, with "minimal" osteoarthritic change at the first tarsometatarsal joint. (R.p. 710). An x-ray of Plaintiff's right foot was taken on April 8, 2005, which found diffusely decreased mineralization and osteophytes on the first metatarsal, and cortical change consistent with post surgical and post traumatic disease seen in the first metatarsal. The mortise was intact, and there was no significant soft tissue swelling seen. (R.p. 709). Plaintiff had an old healed fracture of the distal first metatarsal with mild deformity, with no acute abnormality identified. (R.p. 708).

Notably, Plaintiff does not claim that any of his impairments were of a disabling severity during the period of time represented by the medical records discussed hereinabove. (R.pp. 188, 199). Therefore, in order to obtain disability, Plaintiff must show that his medical problems worsened significantly after this time. Orrick v. Sullivan, 966 F.2d 368, 370 (8th Cir. 1992) [absent showing of significant worsening of condition, ability to work with impairment detracts from finding of disability].

On February 8, 2006 Plaintiff received a disability rating from the Department of Veteran's Affairs, effective December 17, 2005 (one day after Plaintiff's alleged disability onset date



for purposes of his DIB application), of thirty (30%) percent for the right ankle, twenty (20%) percent (each) for left shoulder impingement syndrome, chronic lumbar spine strain, and status post surgeries on his right foot and plantar fasciitis, and ten (10%) percent for recurrent bilateral tennitus. (R.pp. 181-182). There is no reference to any medical records to document these findings, and the next medical records cited by the ALJ relating to Plaintiff's physical impairment are not until May 19, 2008, almost two and a half years later, when Plaintiff was seen in a hospital emergency room after twisting his left knee while coaching his daughter's little league game. (Rpp. 914-915). X-rays were unremarkable, and Plaintiff was diagnosed with a left knee strain. (R.pp. 916-917). When Plaintiff's pain persisted, he went back and had an MRI of the left knee on June 1, 2008, which found a medial meniscal tear with a small joint effusion. (R.p. 939).

Plaintiff thereafter presented to Uniontown Hospital for surgical repair of this tear. A physical examination performed at that time was normal except with respect to left knee tenderness and moderate effusion. It was also noted that Plaintiff had a "slight valgus opening of the knee."[5] (R.p. 947). Plaintiff underwent surgery to repair this tear; (R.p. 948); and in a followup visit on June 26, 2008 the attending physician opined that Plaintiff was "doing perfectly following his knee surgery", his range of motion was non-tender, and his portals looked "perfect". The physician (Dr. Ari Pressman) stated that he would "advance [Plaintiff] gradually back into activities", and would see him back in six weeks. (R.p. 1190).

---

[5] While Plaintiff apparently told the emergency room personnel that he also suffered from PTSD, neither the ALJ nor the Defendant in her brief cites to any medical records where Plaintiff had been diagnosed with that condition at that time.



An x-ray of Plaintiff's lumbar spine on January 29, 2009 found that a "mild" Grade 1 anterolisthesis was probably on S1, that Plaintiff had a "probable" right spondylolysis at L5, with no evidence of acute fracture. Soft tissues were unremarkable. (R.p. 738).

The ALJ noted that there was "minimal evidence of treatment after June 2008 for physical problems", with the next records cited being from March 10, 2010, when Plaintiff underwent a VA examination to determine whether his established service connected disabilities had increased. (R.p. 22); see (R.pp. 704-707). At this evaluation, Plaintiff complained that both of his feet had pain "constantly" that had gotten "progressively worse". He stated that he was able to stand for only about 15 to 30 minutes, was unable to walk more than a few yards, and that he had to use a cane due to his back, knee and ankle pain and for support. However, physical examination of Plaintiff's left foot found no evidence of painful motion, swelling, tenderness, instability or weakness; there was no muscle atrophy of the foot; and no evidence of malunion or nonunion of the tarsal or metatarsal bones, although Plaintiff did have callosities.[6] With respect to Plaintiff's right foot, Plaintiff exhibited pain on motion and abnormal weight bearing, but there was no evidence of tenderness, instability or weakness. Claw foot was present, with toes two and three unable to touch the floor with standing, but the foot again displayed no muscle atrophy and no evidence of malunion or nonunion of the tarsal or metatarsal bones. Again there was callosities. Plaintiff's gait was noted to be antalgic with use of a cane. Plaintiff was also evaluated for left shoulder impingement syndrome (specific date of onset unknown), with the medical note indicating that Plaintiff recalled that he initially injured his left shoulder when installing a fence, and that he was currently

---

[6]Toughened areas in the skin as a result of repeated pressure or repeated contact with rough surfaces. Also known as "corns" or "callus". http://www.askdrshah.com/callosities.aspx.



experiencing moderate pain constantly in his left shoulder with popping and dislocation.  As with his knees, Plaintiff complained that his condition was getting "progressively worse".  (R.pp. 704-707, 713).

While this evidence certainly reflects that Plaintiff had claw foot and used a cane to walk, there is no objective documentation of a significant worsening of his condition.  Trenary v. Bowen, 898 F.2d 1361, 1364 (8th Cir. 1990) [Courts should properly focus not on a claimant's diagnosis, but on the claimant's actual functional limitations]; Cruse v. Bowen, 867 F.2d 1183, 1186 (8[h] Cir. 1989) [The mere fact that working may cause pain or discomfort does not mandate a finding of disability].

On June 8, 2010 Plaintiff presented to Dr. Mabel Kong, a primary care physician, to enroll as a patient with Dr. Kong for primary care.  During his initial screening by the nurse, it was noted that Plaintiff was presenting for an initial new patient appointment, and that while he complained of chronic pain in his feet, left knee and hip, lower back, and left shoulder, he voiced "no acute complaints at present".  (R.p. 313).  Plaintiff advised Dr. Kong of his history of repair of a right ankle tendon rupture, chronic low blood pressure, and left knee, ankle and shoulder pain.  Plaintiff further reported that he had been taking Gabapentin "on and off for a long time", and had also taken Vicodin and Oxycodone, which "did not help".  On examination Plaintiff was found to be alert and oriented x3, and in no acute distress, while neurologically he had normal muscle tone, strength and coordination.  Cf. Gaskin v. Commissioner of Social Security, 280 Fed.Appx. 472, 477 (6th Cir. 2008) [Finding that evidence of no muscle atrophy and that claimant "possesses normal strength" contradicted Plaintiff's claims of disabling physical impairment].  Sensory exam was unremarkable, and his deep tendon reflexes were equal and symmetrical.  He was noted to have a



right ankle scar on the dorsum of the foot, and he could not do dorsi flexion and plantar flexion. He complained of tenderness at the joint line in the left knee, but had no limitation of movement. He also complained of tenderness in the lower back, but he had no muscle spasm. His extremities also displayed no edema, clubbing or cyanosis, and his distal pulses were present bilaterally. Dr. Kong assessed Plaintiff with repair of right ankle tendon rupture, for which she prescribed Gabapentin. She also diagnosed right knee, shoulder and lower back pain, for which she recommended stretching exercises. (R.pp. 310-312). See Robinson v. Sullivan, 956 F.2d 836, 840 (8th Cir. 1992) [generally conservative treatment not consistent with allegations of disability].

In December 2010, Plaintiff was provided with a hinged knee brace for the tear of the medial meniscus in his left knee as well as custom orthotics for his foot and ankle. (R.pp. 355-357).

On June 30, 2011, state agency physician Dr. E. Woods completed a Residual Functional Capacity Assessment for the Plaintiff after review of Plaintiff's medical records from June 3, 2010 through December 31, 2010.[7] Dr. Woods opined that Plaintiff had the RFC for medium work[8] with the ability to stand and/or walk (with normal breaks) for a total of about six hours in an eight hour work day, sit (with normal breaks) for a total of about six hours in an eight hour work day, with an unlimited ability to push and/or pull. Dr. Woods further found that Plaintiff had no postural, manipulative, visual, communicative, or environmental limitations, noting that Plaintiff's medical records reflected that while he walked with a cane and wore a left knee brace and right ankle brace,

---

[7]The date Plaintiff's eligibility for DIB expired.

[8]Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds." 20 C.F.R. §§ 404.1567(c), 416.967(c).

10



his knees and "from.cn's were intact, and that he had normal muscle tone and motor strength". (R.p. 96-97).

With respect to Plaintiff's mental health, there really are no medical records noted addressing this issue until June 3, 2010, when Plaintiff was seen in the hospital emergency room feeling "uneasy" and needing a medication refill. (R.pp. 24, 319). Plaintiff told the attending physician that he had been diagnosed with disassociative disorder after serving in Iraq, and that he had previously been taking Neurotin but was not at that time. Plaintiff further stated that his wife had a "stalker on the internet", and that the ordeal had made him irritated. On examination it was noted that Plaintiff had a brace on his right ankle and foot, but that he had no edema and normal range of motion. Psychiatrically, it was noted that Plaintiff appeared "agitated when speaking about stalker otherwise thought process coherent". There was no signs of psychosis, and he had a normal affect. He was noted to use a cane when ambulating. (R.pp. 319, 321). After some monitoring (blood work and a urine specimen were also obtained), Plaintiff was discharged home ambulatory with use of a cane, at which time he was alert and oriented x3. (R.pp. 324-325). Plaintiff was provided a prescription for Neurontin. (R.p. 320).

Plaintiff thereafter had a routine mental health assessment performed on June 17, 2010. Plaintiff's VA disability rating was noted, which did not include a mental impairment. Plaintiff complained of irritability, fear, and that he had periods of "feeling numb and then he get[s] angry and blows up," and he was given a "provisional diagnosis" on presentation of PTSD. Plaintiff told the evaluator (Pamela Ferguson) that when he got angry he yells and beats his truck with a baseball bat, that he had difficulty being around forklifts (apparently his foot crush injury occurred when ammunition fell off a forklift), and that the night before last he had hallucinated that his front



yard was sand, and further that he had hallucinations usually once a month.  He also complained of having problems with nightmares and loud noises.  It was noted, however, that Plaintiff had never had any hospitalizations due to psychiatric problems, or even any outpatient treatment for any psychiatric disorder.  Plaintiff also denied that he had ever received any medications in the past for a psychiatric condition or problem.  Plaintiff's only active medication regimen at that time was he was still taking Gabapentin.  Plaintiff reported that he had a high school education, that he had been married (five times), and that he had had a DUI in 1998 and an assault with a deadly weapon charge in 1992.

On examination, Plaintiff's energy and concentration were fair.  Plaintiff's mood was noted to be "anxious", but his thoughts were found to be logical and goal directed without evidence of thought disorder or delusion.  He also had no suicidal/homicidal ideation, and no auditory/visual hallucinations.  Plaintiff was not considered to be a danger to himself or others.  Plaintiff described his past traumatic events as being "wounded" in 2003 when ammunition got dumped on him in Kuwait.  He also reported being on combat patrols and other dangerous duty "about 1-3 times", including being under "enemy fire about 1 month".  However, Plaintiff stated that no one in his unit was ever injured, killed, wounded, or missing in action.  Plaintiff advised that his trauma symptoms had begun in 2003, and had lasted about six years.  When asked to describe the subjective level of his distress, Plaintiff replied "moderate just guessing".  Evaluator Ferguson stated that this was Plaintiff's second or third evaluation for PTSD, and that his history indicated he had a diagnosis of adjustment disorder with mixed anxiety and depression.  Ferguson further stated, however, that it was "difficult to accept the validity of [Plaintiff's] answers.  By his self report he was here to be evaluated so that he can file another claim to get his disability increased".  Cf. .Anderson v. Barnhart,



344 F.3d 809, 815 (8th Cir. 2003) [Evidence that a claimant is exaggerating symptoms can be considered as part of the evaluation of Plaintiff's subjective complaints]. She assessed Plaintiff with adjustment disorder with mixed anxiety and depression by history, rule out malingering, narcissistic personality disorder, and assigned him a GAF of 55.[9]  (R.pp. 361-369).

The ALJ also noted that Plaintiff had a neurological evaluation on July 9, 2010. Plaintiff told the evaluator that when the ammunition crate fell on him in 2003, he was not wearing a helmet and had hit his head on a metal van.  Plaintiff stated that although he did not seek treatment after this event, he was unconscious for five to ten minutes.  Plaintiff told the evaluator that he was currently experiencing dizziness, nausea, and memory loss on a daily basis.  Plaintiff was noted to have a normal affect, and tests to establish Plaintiff's attention, executive function, memory and judgment were all normal.  Neurologically, Plaintiff was found to be grossly intact, his reflexes were +2 and symmetric throughout, except with respect to his right foot, and he had 5/5 (full) motor strength and good muscle tone throughout, except for the right ankle.  Plaintiff was assessed with an adjustment disorder.  (R.pp. 344-346).

Plaintiff went to see Dr. Michael Butler on August 23, 2010 for the purpose of "orienting to therapy, gathering clinical history, and identifying treatment goals".  Dr. Butler went over an oral history with Plaintiff, with Dr. Butler describing Plaintiff's mood as "anxious".  Dr. Butler's report states that Plaintiff "describe[d] traumatic events that reasonably could be related to a PTSD diagnosis", that Plaintiff's symptoms were "consistent with a PTSD diagnosis[ ] which has

---

[9]"Clinicians use a GAF [Global Assessment of Functioning] to rate the psychological, social, and occupational functioning of a patient." Morgan v. Commissioner of Soc. Sec. Admin., 169 F.3d 595, 597 n.1 (9th Cir. 1999).  A GAF of 51 to 60 indicates that only moderate symptoms are present. Perry v. Apfel, No. 99-4091, 2000 WL 1475852 at *4 (D.Kan. July 18, 2000); Matchie v. Apfel, 92 F.Supp.2d 1208, 1211 (D.Kan. 2000).



largely been untreated since 2004", and that Plaintiff appeared "very motivated for therapy". (R.p. 292). Plaintiff returned to see Dr. Butler on September 2, 2010, where he reported that he had "no significant improvements since the previous appointment". Plaintiff told Dr. Butler that he had recently "punched a stranger", but had then had "no recollection of doing . . . .". Plaintiff also complained of nightmares and difficulty sleeping. A "detailed sleep hygiene plan" was developed. However, when Dr. Butler apparently told Plaintiff that his case would be transferred to someone else due to staffing changes, he noted that Plaintiff became "very upset". (R.p. 290).

At his next appointment with Dr. Butler on September 7, 2010, Plaintiff again reported no significant improvements since his previous appointment. Plaintiff told Dr. Butler that he had not attempted much of the sleep hygiene guidelines he was supposed to be using due to a "very hectic week". Plaintiff advised that he had had company visiting, as well as that he had had to attend to some home repairs, car repairs and "some personal injury" that had occupied his time the past week. Plaintiff told Dr. Butler that he had been having difficulty with his memory, particularly over the past two years, with the consultation entry noting that Dr. Butler then "reminded [Plaintiff] that those with PTSD symptoms sometimes have difficulty with memory". Plaintiff denied any side effects from medications. (R.p. 288).

Plaintiff's case file was then transferred to Dr. Jeffrey Meyer, who saw the Plaintiff on September 23, 2010. Plaintiff orally reviewed his medical and personal history with Dr. Meyer, including that he drinks approximately three times a week, sometimes as much as twenty-four beers at a time. The only medication Plaintiff was noted to be on was Gabapentin. On examination Plaintiff's mental status was noted to be mildly agitated and anxious, although his behavior was appropriate. He had a constricted affect, but his thought content was normal and there was no



evidence of delusions or hallucinations.  He was oriented to person, place and time, he had normal insight and judgment, normal memory, normal intelligence, normal abstraction, and he was neither suicidal or homicidal.  Dr. Meyer assessed Plaintiff with a GAF of 55, and he was prescribed some Zoloft and Trazodone.  (R.pp. 283-285).  Plaintiff was seen again by Dr. Meyer on October 25, 2010, at which time Dr. Meyer stopped Plaintiff's Trazodone because it was not effective and caused nasal congestion, and increased his Zoloft prescription.  Plaintiff stated that he was "a little better", but continued to have PTSD and depressive symptoms.  Plaintiff denied side effects from his medications.  Dr. Meyer assigned Plaintiff a GAF 60.  (R.pp. 272-276).

On December 3, 2010 Plaintiff was seen by Sara McLaughlin, a clinical psychologist. Plaintiff again orally went over his medical and personal history, including that he and his wife had decided to divorce.  Plaintiff further advised that he "felt he had resolved the issues in his past, such as abuse and was comfortable with many difficult things that had happened in his life", but that he "continued to struggle . . . with events from the war . . . .".  Plaintiff was also apparently seen by Dr. Meyer on that date, as it was noted that he assigned Plaintiff a GAF of 59.  (R.pp. 267-270).  On December 16, 2010 Plaintiff was assigned a GAF of 55, with a notation that "Vet is pending a divorce".  (R.p. 259).

On May 5, 2011, state agency physician Dr. James Brown reviewed Plaintiff's medical records from June 3, 2010 through December 31, 2010 and completed a Psychiatric Review Technique Evaluation in which he opined that Plaintiff's anxiety related disorders resulted in no restriction in Plaintiff's activities of daily living or with respect to maintaining concentration, persistence or pace, and only mild difficulties in maintaining social functioning, noting that Plaintiff's medical records indicated that he had been diagnosed with PTSD and was seeking



constant treatment, with his most recent mental status examination being normal with no hallucinations, or suicidal or homicidal ideation. (R.pp. 84-85). On July 6, 2011 another state agency physician, Dr. Banu Krishnamurthy, reviewed Plaintiff's medical records for the same period of time and completed a Psychiatric Review Technique Evaluation form in which he opined that Plaintiff had a mild restriction in his activities of daily living, and a moderate restriction in social functioning and with respect to concentration, persistence or pace, noting that while Plaintiff's most recent mental status examination was normal he had recently gotten into an argument with his wife and pushed her. (R.pp. 93-94). With respect to an evaluation of the earlier period from December 16, 2005 (Plaintiff's alleged disability onset date) through June 2, 2010, Dr. Krishnamurthy opined that there was insufficient evidence to establish any mental impairment. (R.pp. 94-95). Smith v. Schweiker, 795 F.2d 343, 345 (4th Cir. 1986) [Opinion of non-examining physicians can constitute substantial evidence to support the decision of the Commissioner].

In addition to these records, the ALJ also noted that Plaintiff received a new disability rating from the VA on January 24, 2012, which granted him a fifty (50%) percent impairment effective March 10, 2010 for his PTSD. The VA noted that Plaintiff had only received a fifty (50%) percent impairment rating because a higher rating was not warranted, because the evidence "fail[ed] to show there are deficiencies in most areas, such as work, school, family relations, judgment, thinking, or mood" due to his condition. The report further stated that the reason the effective date was March 10, 2010 was because that was the date they had received his claim, and that further, since there was a likelihood of improvement, this disability rating was "not considered permanent and is subject to a future review examination". Otherwise, Plaintiff was provide a forty (40%)



16

percent impairment rating for his chronic lumbar spine strain, while his request for a rating for a disassociative disorder was denied. (R.pp. 375-380).

## II.

## (Decision Analysis)

The ALJ reviewed this medical record and concluded with respect to Plaintiff's mental impairment that his adjustment disorder, narcissistic personality disorder, and PTSD resulted in moderate limitations in Plaintiff's activities of daily living, social functioning, and with respect to maintaining concentration, persistence or pace. (R.pp. 19-20). Substantial evidence in the case record supports these findings.

With respect to daily living and social functioning, the ALJ noted that although Plaintiff reported that he avoids being around others and has been involved in some altercations, he is married and lives with two of his children, goes to church, and testified that he has gone to counseling and support groups at the VA. Plaintiff was also able to drive, go shopping occasionally, and watch television; he helps his children with their homework, and even engaged in such activities as coaching his daughter's little league team. The ALJ also noted that during various physical and psychological evaluations, Plaintiff had always been able to interact appropriately and communicate his views and feelings without significant difficulty. (R.pp. 19-20). Cf. Johnson v. Barnhart, 434 F.3d 650, 658 (4th Cir. 2005)[Accepting ALJ's finding that claimant's activities were inconsistent with complaints of incapacitating impairments where she engaged in a variety of activities]; Mastro v. Apfel, 270 F.3d 171, 178 (4th Cir. 2001) [ALJ may consider whether claimant's activities are consistent with allegations].



In addition to the evidence of Plaintiff's conduct and activities, the ALJ also noted the results of Plaintiff's mental status examination on June 17, 2010, where his mood was noted to be anxious, but normal with a congruent affect, that his thoughts were found to be logical and goal directed without evidence of a thought disorder or delusion, and that he had been assigned a GAF of 55, indicating the presence of only moderate effects from any mental impairment. It was also noted that Plaintiff had no history of either inpatient or outpatient treatment for a mental disorder, he was not on medications for mental disorders at that time, and that the evaluator had expressed skepticism about Plaintiff's self report of the extent of his symptoms. (R.p. 25). Hunter v. Sullivan, 993 F.2d 31, 35 (4th Cir. 1993)[ALJ may properly consider inconsistencies between a plaintiff's testimony and the other evidence of record in evaluating the credibility of the plaintiff's subjective complaints].

The ALJ further noted that Dr. Meyer had also assigned Plaintiff a GAF of 55; (R.p. 26); while Dr. Krishnamurthy had determined that Plaintiff only had moderate social limitations due to any mental disability. (R.p. 28). Johnson v. Barnhart, 434 F.3d 650, 658 (4th Cir. 2005) [ALJ can give great weight to opinion of medical expert who has thoroughly reviewed the record]. Indeed, the ALJ further noted that the other state agency physician, Dr. Brown, had opined that Plaintiff had only a mild limitation in social functioning with no limitation in his daily activities due to a mental impairment, even less than the moderate levels assessed by the ALJ. (R.p. 28). See Marquez v. Astrue, No. 08-206, 2009 WL 3063106 at * 4 (C.D.Cal. Sept. 21, 2006)[No error where ALJ's RFC finding was even more restrictive than the exertional levels suggested by the State Agency examiner]; see also Silver v. Colvin, No. 11-303, 2014 WL 4160009 at * 5 (M.D.NC. Aug. 19, 2014) [Same]; cf. Muir v. Astrue, No. 07-727, 2009 WL 799459, at * 6 (M.D.Fla. Mar. 24, 2009)[No error



where ALJ gave Plaintiff even a more restrictive RFC than the medical records provided]. Therefore, substantial evidence supports the ALJ's finding that Plaintiff had no more than a moderate limitation in his activities of daily living and social functioning.

With respect to concentration, persistence or pace, the ALJ noted that Dr. Krishnamurthy opined that Plaintiff had no more than a moderate limitation with respect to concentration, while again Dr. Brown opined that Plaintiff had no limitation in this area of functioning. (R.p. 28). The ALJ also noted that while Plaintiff reported that he has problems with concentration and that his "mind will wander", that no significant concentration or attention problems were ever noted during any of his mental status examinations, that Plaintiff is able to drive, help his children with their homework, and was even able to coach a little league team. (R.p. 20). Further, at his neurological evaluation in July 2010, it was noted that Plaintiff's attention, executive function and memory were all normal. (R.pp. 344-346). The ALJ also noted that during his therapy appointment in September 2010, Plaintiff reported he had had a "hectic week" that had included having company visiting while he was also attending to home and car repairs. (R.p. 26). Dr. Meyer's records also generally reflect normal insight and judgment, normal memory, normal intelligence, with GAFs between 55 and 60. (R.pp. 259, 267-270, 272-276, 283-285). Again, there is substantial evidence in the record to support the ALJ's finding that Plaintiff had no more than a moderate limitation with respect to concentration, persistence or pace. Gross v. Heckler, 785 F.2d 1163, 1166 (4th Cir. 1986) [The mere presence of impairments does not automatically entitle a claimant to disability benefits, there must be a showing of related functional loss].

The ALJ also extensively reviewed Plaintiff's history of physical complaints, noting that Plaintiff does have feet problems which can cause pain and that he walked with an antalgic gait.



However, the ALJ also noted that x-rays and MRIs of Plaintiff's lower extremities reflected generally minimal findings, as did x-rays and MRIs of Plaintiff's back and shoulder. See (R.pp. 708-710, 719, 721, 723-725, 738, 925). Further, physical examinations generally reflected normal muscle tone, coordination and strength, with the ALJ also noting that Plaintiff was able to drive and, again, had even coached his daughter's little league team. (R.pp. 22-25). Thomas v. Celebreeze, 331 F.2d 541, 543 (4th Cir. 1964) [court scrutinizes the record as a whole to determine whether the conclusions reached are rational]; see also Hays, 907 F.2d at 1456 [It is the responsibility of the ALJ to weigh the evidence and resolve conflicts in that evidence]. The ALJ also noted the findings of Dr. Woods, who opined that Plaintiff's medical records showed that he could perform up to a level of medium work activity, significantly higher than the sedentary RFC assigned by the ALJ. (R.p. 28). Marquez, 2009 WL 3063106 at * 4 [No error where ALJ's RFC finding was even more restrictive than the exertional levels suggested by the State Agency examiner].

Based on her review of the entire record, the ALJ concluded that while Plaintiff's lumbar and lower body impairments were not disabling, the evidence of Plaintiff's lower extremity and spine impairments and complaints of pain was sufficient to limit him to performing work that did not require any pushing or pulling with the lower extremities or climbing of ladders/ropes/scaffolds, with only occasional balancing, stooping, kneeling, crouching, crawling, or climbing of ramps and stairs. Additionally, in consideration of Plaintiff's left shoulder impingement syndrome, she further restricted Plaintiff from any overhead work with the left upper extremity. (R.p. 21). These limitations account for the findings assigned by the ALJ. See Welch v. Heckler, 808 F.2d 264, 270 (3d Cir.1986)[findings of moderate pain or discomfort were appropriately accounted for in a reduced RFC finding]; Andreolli v. Comm'r of Soc. Sec., 2008 WL 5210682, at



*4 (W.D.Pa. Dec. 11, 2008) ["it is well settled that a claimant need not be pain-free or experiencing no discomfort in order to be found not disabled" (citing Welch v. Heckler, 808 F. 2d at 270)]. As noted, Plaintiff has presented no arguments or pointed to any evidence in the record to contest these conclusions, which the undersigned finds are supported by substantial evidence in the case record, all as is discussed hereinabove, supra. Plummer v. Astrue, No. 11-6, 2011 WL 7938431, at * 5 (W.D.N.C. Sept. 26, 2011)[It is the clamant who bears the burden of providing evidence establishing the degree to which his impairment limits his RFC], adopted by 2012 WL 1858844 (May 22, 2012), aff'd. 47 Fed. Appx.  795 (4th Cir. 2012); Hepp, 511 F.3d at 806 [Noting that the substantial evidence standard is even "less demanding than the preponderance of the evidence standard"].

          Finally, the ALJ noted the VA disability rating from February 2006, where Plaintiff was assessed with a thirty (30%) percent disability for his right ankle, twenty (20%) percent disability due to his left shoulder impingement syndrome, twenty (20%) percent disability due to chronic lumbar spine strain, twenty (20%) percent disability for status post right foot surgeries, and ten (10%) percent disability due to bilateral tinnitus, as well as Plaintiff's subsequent VA disability rating on January 24, 2012, effective from March 10, 2010, that gave him a fifty (50%) percent service connected disability due to PTSD, a forty (40%) disability for lumbar strain (although the VA was considering reducing this disability to ten (10%) percent due to improvement on Plaintiff's most recent examination), with Plaintiff's request for service connection disability for a disassociative disorder being denied.  (R.pp. 22, 28).  While a VA disability determination is not binding on the SSA, it can nevertheless be entitled to substantial weight, and in determining whether a claimant is entitled to SSA disability benefits, an ALJ should explain the consideration given to a VA disability decision.  Bird v. Commissioner of Social Security, 699 F.3d 337, 343-344 (4th Cir.



Nov. 9, 2012) ["SSA must give substantial weight to a VA disability rating. However, . . . an ALJ may give less weight to a VA disability rating when the record before the ALJ clearly demonstrates that such a deviation is appropriate."]; see also SSR 06-03P, 2006 WL 2329939, at * 7 (SSA) [ALJ "should explain the consideration given to [the VA disability determination] in notice of decision . . ."]. The ALJ fulfilled this requirement in this case.

The ALJ specifically discussed the VA's disability rating in her decision, and gave it "some weight". In doing so, the ALJ discussed the history of these VA determinations, noting that Plaintiff had originally been provided a fifty to seventy percent service related disability with an effective date of December 17, 2005, with the new rating effective March 10, 2010 changing his rating to fifty (50%) percent for PTSD and forty (40%) for lumbar strain,[10] subject to further reduction, with no award for a claim of disassociative disorder. The ALJ also noted the VA's most recent decision stating that Plaintiff did not have deficiencies in most areas of functioning due to PTSD, while his lumbar strain had actually improved. See (R.pp. 32-33); see generally, (R.pp. 181-182, 375-380). Further, after specifically discussing the VA's findings and ratings and her decision to give the VA decision some weight, the ALJ articulated that the record before her demonstrated and supported her finding that the Plaintiff was not disabled under the different standard for disability under the social security rules. Cf. Bennett v. Colvin, No. 13-871, 2015 WL 354170, at * 5 (E.D.N.C. Jan. 17, 2015) [Comparing the different standards for determining disability under the Social Security Regulations and the VA Regulations]. Specifically, she found that Plaintiff's

> clinical examinations and objective test results have not revealed the presence of any
> acute or chronic abnormalities that would be severe enough to prevent the [Plaintiff]

---

[10]When a person has more than one disabling condition which is given a VA disability rating, the ratings for each disability *are not* combined for a total disability rating. Rather, a formula is applied to calculate the total rating. See 38 C.F.R. § 4.25.



from performing at least some sedentary, low stress, low social contact work activity. In addition, the [Plaintiff] has received minimal and conservative treatment for his impairments and not treating physician has ever found him to be totally disabled and unable to work.

(R.p. 33). See Bird, 699 F.3d at 343-344 ["ALJ may give less weight to a VA disability rating when the record before the ALJ clearly demonstrates that such a deviation is appropriate."]

The ALJ's findings of moderate limitations in Plaintiff's mental functioning with a limitation to sedentary work with the restrictions noted are not inconsistent with some weight being given to these VA disability ratings while noting the change in Plaintiff's condition over the course of his period of eligibility for DIB. The ALJ discussed these ratings and the weight given to them based on her findings, which she was required to do, and Plaintiff has provided no argument to support a finding of reversible error in the ALJ's treatment of this evidence. Bennett, 2015 WL 354170 at ** 5-8 [Considering the standard set forth in Bird, but finding no error where ALJ gave VA's decision limited weight based on the medical records not substantiating disability under the social security regulations]; cf Johnson v. Colvin, No. 13-509, 2014 WL 4636991 at **8-10 (E.D.N.C. Sept. 16, 2014)[finding no error under Bird standard for ALJ according VA decision less weight]; Mills v. Colvin, No. 13-432, 2014 WL 4055818 at ** 2-3, 7-9 (E.D.N.C. Aug. 14, 2014)[same]; see also Poling v. Halter, No. 00-40, 2001 WL 34630642, at * 7 (N.D.W.Va. Mar. 29, 2001) ["It is the duty of the ALJ, rather than the reviewing court, to assess the evidence of record and draw inferences therefrom"], citing Kasey v. Sullivan, 3F.3d 75, 79 (4th Cir. 1993).

## Conclusion

As previously noted, Plaintiff has not provided the Court with any argument for why he believes the decision of the Commissioner was in error. Bowen, 482 U.S. at 146 [Plaintiff has the burden to show that he has a disabling impairment]. The undersigned has nevertheless



undertaken an independent review of the decision and the relevant evidence, and in the absence of any cited or identified reversible error from the parties, finds that the record contains substantial evidence to support the conclusion of the Commissioner that Plaintiff was not disabled within the meaning of the Social Security Act during the relevant time period.  <u>Shively v. Heckler</u>, 739 F.2d 987, 989 (4th Cir. 1984) [Defining substantial evidence as ". . . evidence which a reasoning mind would accept as sufficient to support a particular conclusion"].  Therefore, it is recommended that the decision of the Commissioner be **affirmed**.

The parties are referred to the notice page attached hereto.



_____
Bristow Marchant
United States Magistrate Judge

April 28, 2015
Charleston, South Carolina

**Notice of Right to File Objections to Report and Recommendation**

  The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge.  Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections.  "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'"  *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

  Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see* Fed. R. Civ. P. 6(a), (d).  Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

Robin L. Blume, Clerk
United States District Court
Post Office Box 835
Charleston, South Carolina 29402

  **Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.**  28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).

